We'll hear the first case, Pena-Barrero. May it please the Court, we represent Luis Pena-Barrero, the plaintiff appellant. We ask that the Court reverse the grant of summary judgment. Mr. Pena-Barrero filed this lawsuit because he was terminated from the City of New York. The decision was based on disability, race, and in retaliation for a prior lawsuit that settled in May 2012. Mr. Pena-Barrero is from Bogota, Colombia. He served honorably in the U.S. Marines. But Mr. Pena-Barrero also lives in an invisible prison. That is, he is severely bipolar. Can I ask you at the outset, what evidence do you have that any of the individual defendants played any role in causing Ms. Knoll or Mr. Parker to take the actions? Your Honor, the evidence is prior to his termination based on the civil service law. There was animus expressed towards Mr. Pena-Barrero based on his disability. Prior to meaning what time period? This would be in and around May 2012. There was evidence of animus that I can go through. And then at the time, Ms. Knoll and others that you mentioned, Your Honor, terminated him based on the civil service list. There's also evidence that the city and the defendants have ways to retain provisionals, even in the face of a certified list. So the evidence of that is that from- You got the letter. He was terminated. Your client was terminated by a letter from Monique Knoll, who was head of human resources. Yes. The day after she was instructed by Benjamin Parker that all provisionals, I'm quoting, serving in titles with active eligible lists of over four years must be removed immediately. And so my question is, what evidence is there that any of the individual defendants played any role in causing Ms. Knoll or Mr. Parker to take those particular actions? Your Honor, the evidence is that they could have chosen to transfer Mr. Pena-Barrero to a similar title. And there's evidence that we have an email in the record at appendix 948 that says there are a few ways out of this predicament, meaning the predicament of a provisional employee, such as a title transfer or to be transferred to a different agency. And DCIS Deputy Commissioner Shamika Boyer, that also works with Ms. Knoll, also testified the city can choose to transfer provisionals. They did that as example for the clock worker, Mr. Schneider, by changing his title and saved him. And that goes with the evidence that we have based on the email, there's a way out of this predicament. And also, Abigail Sebrow also admits in her testimony that provisionals in her unit were also transferred to other city agencies, not terminated. So the evidence that we have is that the city has discretion, even when someone is provisional and there is a certified list. And in fact, the number of provisionals serving at DCIS actually increased in the year after Mr. Pena-Barrero was terminated. Now, I want to be clear, that's not for his exact title, but overall provisionals in the city. So the argument that the city's hands were tied and they absolutely had to do this under the service law isn't quite accurate. So that's our main evidence that the city had ways out of it. The other main point of why Mr. Pena-Barrero did not need to be terminated is the Section 55A. Now, looking at that evidence, Section 55A allows a disabled employee to be placed in an exempt position where they can retain their position, even if there is a certified list and they are provisional and they haven't taken a civil service exam. So... Is there anything in the record that shows that there were fewer than the 700 exceptions already in place? We do not have that in the record, Your Honor, that I'm aware of. We don't know if the 700... Our main point is that he didn't even get to that stage of being rejected because before the settlement in May 2012, Mr. Pena-Barrero applied in writing, never heard back. He followed up in writing again, never heard back from the city. After the May 2012 settlement, he asked his supervisor, Defendant Weir, can I be certified under Section 55A? And they would know, the defendants would know, that that would protect his job. So the refusal to respond, and then what happened with Mr. Weir, Mr. Weir said, I'll speak to Defendant Kerman. They never responded to Pena-Barrero. And this evidence is coming from Mr. Pena-Barrero's testimony, which would be admissible as a party-opponent admission. Isn't it the case, correct me if I'm misunderstanding, that there were multiple, he had multiple chances to take the civil service exam to get out of provisional status, but he chose not to do so? You're correct, Your Honor. He had multiple chances. The one main chance in, I believe it was January 2012 or right at the end of 2011, he was hospitalized in a manic state. And the person that would have had to have allowed him to make up the exam was Mr. John Castellaneta, and he was a defendant in the prior lawsuit. And he made statements to Mr. Pena-Barrero that I will never allow you to be certified  And the city also, I think, cited that there were two other exams in 2009 that he could have taken, but he would have had no reason to take a 2009 exam in another title if he was expecting to take the 2012 or 2011 exam but for his manic state in the hospital. So it is correct that Mr. Pena-Barrero never took the exam. But under our argument... Did he correctly apply for a 55A exemption? Did he file the papers with whom everyone was supposed to file them? We believe the answer to that is yes, Your Honor. He did correctly apply. He applied in writing to Frank Pulmonary, who was the 55A coordinator  The district court judge found that he did not... You're saying that he followed the procedures that are set forth for making the 55A application? We are saying that, Your Honor. The district court found... No deviation. He did exactly what you're supposed to do. Well, Your Honor... I mean, I'm trying to understand whether you're saying we argue that what he did should qualify as an application or are you saying he did what is specified as what you do to apply? We're saying he did what is specified. And that is what? The city... If you look at Section 55A, it does not designate a very clear protocol of what you have to do. It appears that the law leaves it up to the discretion of a city agency or municipal agency to decide how employees should apply. Our point in appealing here is that the district court relied on the city's one-page, undated pamphlet that said inquiries may, and I'm quoting, may be directed to the 55A coordinator or personnel. So we're looking at the record and saying that's exactly what Mr. Peña-Barrero did. He submitted the letter to Frank Pulmonary, and we don't think that there's res judicata on that just because he settled. The prior lawsuit, and then afterwards he asked his direct supervisor, Defendant Weir, I would like to be certified Section 55A. And our reading of the law, there's no other requirement, and the district court erred by saying he didn't follow the correct steps, he didn't speak to the right person. And Mr. Weir never directed him to anyone else. What he said is I will speak to Defendant Kerman about it. Now, when you look at pretext and animus, in their depositions they basically both said we're not very familiar with that, and one of them said I don't really know what that is. So that shows deceit, even though they did have that conversation with Mr. Peña-Barrero, if you credit plaintiff's testimony, as we believe the court must, on a summary judgment. Posture. I see my time is up.  You'll have two minutes in rebuttal. Thank you very much. May it please the court, my name is John Moore, here on behalf of the New York City Defendants. Plaintiff's employment with the city ended because he didn't have the necessary civil service qualification for his position. Thus, he was terminated as a function of state law. Plaintiff's attempt to make the case about anything other than that fails for lack of support in the record. Thus, the district court correctly dismissed the case on summary judgment. I want to correct just a couple of points. The point just being made a moment ago, that he did do what is required to apply for the 55A. I think that arguably he did before the settlement of the first lawsuit. I think that the letter to Frank Palmieri could have qualified as an application. But that application came and no action was taken on that application before the settlement of that first lawsuit. When the first lawsuit, when that settlement then barred any claims going forward from events, I think from the beginning of the world to the moment that the settlement was agreed to, that precludes him from now raising a claim that he should have been granted 55A status based on that application. He knew at the time the settlement was entered into that his job was at risk if he wasn't certified for his title, or didn't find some alternative way around that requirement. The fact that the settlement agreement did not provide for a subsequent taking of the test, did not provide for 55A status, means that he cannot now bring a claim based on that, and that he's not entitled to anything further. Regarding the conversation with his supervisor, Frank Weir, he makes the statement that there was evidence of deceit in the record because his supervisors aren't terribly familiar with the 55A program. To be clear, this is a very narrow program. It applies to 700 employees at maximum citywide out of approximately 350,000 city employees. The idea that every single supervisor must be intimately familiar with the program is not supported by anything in the record. Moreover, he misstates the nature of that conversation with Frank, with Mr. Weir. And I'd refer the Court to page 497 of the record for that. According to Mr. Peña-Barrero's deposition testimony, he said that he went to Mr. Weir, said I'm interested in this program. In response, Mr. Weir said nothing. He said that he couldn't talk to plaintiff right then because he had to go talk to Mr. Kerman. He did not say he was going to talk to Mr. Kerman about the program. He said nothing, according to the deposition testimony on that page. That's mirrored by plaintiff's deposition testimony that can be found at page 512 of the record. Describing the conversation with Mr. Weir, plaintiff described Mr. Weir's response as nothing. He stared politely. There was no promises to follow up despite the statements made in the reply brief. That just doesn't exist in the record. That's not what the record says. And the argument that inferences were drawn against plaintiff during the course of the district court's decision isn't borne out because it's not drawing an inference against him to say that that's not what the record says. It's just reading the record. In terms of whether the application for 55A status was made subsequent to the settlement agreement, he says, well, speaking to supervisors ought to have qualified, that that step should have qualified. But in plaintiff's 56.1 statement of undisputed facts, and this is on page 981 of the record, plaintiffs admit that the law requires, at least city policy regarding the law, requires that inquiries be directed to the personnel officer 55A coordinator. That's not your immediate supervisor within your work unit. And nor does it make sense to, again, this is a very narrow program. It just doesn't apply to many people. It doesn't make sense to expect that every single person who manages city employees is intimately familiar with this program and can take appropriate steps to follow up on it. Can I ask you about the remarks of Ware and Dazzo? Of course. So the district court said, with respect to those remarks, which were, they don't like Spics, quote, unquote, or people of Hispanic origin, and, quote, all Colombians are bringing drugs to this country. The court said that that's the only evidence that is presented that remotely hints at race or national origin discrimination. But why aren't those enough to create a question of material fact as to whether they discriminated against Mr. Pinabarero on the basis of his race or national origin or created a hostile work environment? So let me take the discrimination claims and then the hostile work environment claims separately, because they're judged under slightly different standards. And so as to discrimination, the reason that that doesn't create any material issue of fact is that Mr. Ware and Mr. Dazzo had no role in terminating plaintiff's employment. The answer to Your Honor's initial question to opposing plaintiff is nothing in the record links the actions, feelings, thoughts of these particular defendants to the termination of plaintiff. That came about as a result of the straightforward application of the civil service law. So even to the extent that that indicates some animus on the part of Mr. Ware or Mr. Dazzo, it doesn't have any causal connection to the actual discrimination that plaintiff is claiming, that he was terminated from his job. And so absent any causal connection, any discrimination claim fails. As in terms of the hostile work environment claim, this court has indicated in the Schwab versus Town of Avon decision that isolated remarks, even racial slurs, are not themselves sufficient to create a hostile work environment. There has to be more to it than isolated remarks. In fact, plaintiff said in his deposition testimony, and this is on page 141 of the record, that he didn't take the remarks all that personally. He certainly never sent an email or any other contemporaneous documentation complaining about those remarks, despite the fact that he did complain, for instance, about the desk chair incident. So taking these statements to create an environment permeated with intimidation, discrimination, ridicule, insult, does not find support in the record. Moreover, and specifically as to the remarks about, I think, Colombians, all they do is bring drugs into the country, there's no indication that supervisors knew that Mr. Peña-Berrero was Colombian. In fact, each of the supervisors on pages 270, 289, and 709 of the record indicated that they didn't know that he was from Colombia until this lawsuit was filed. So it doesn't make sense to say that they were targeting, that they were creating a hostile work environment directed at him based on those comments, even if they were certainly inappropriate to have said in the workplace. It just doesn't give rise to a legal claim from plaintiff here. As with many of these claims, it's an attempt to make much ado about nothing, and is particularly contradicted by the clear evidence in the record that the reason for Mr. Peña-Berrero's termination was he just didn't meet the qualifications, and just one more point as I'm speaking about these qualifications on discrimination. Shifting to the pretext discussion skips the fact that Mr. Peña-Berrero undisputedly has not made a prima facie case here. He has not shown that he was qualified for his position, that he met his employer's honestly held criteria for the job. He didn't have the civil service qualification that's required by state law. So even getting into the pretext inquiry is skipping over the fact that he hasn't met the first step of the McDonnell-Douglas test, and shown that he was qualified for his position making that prima facie case. The city was not under an obligation to transfer him to another position like administrative staff analyst he claims, which is actually a supervisory position that requires 18 months of supervisory experience. Mr. Peña-Berrero has not shown that he has that or grant him 55A status to the extent that he even properly applied for it. Given that the record shows that the reason for his termination, that the reason for his treatment was based on his lack of qualifications for the job. His termination was appropriate and the district court correctly granted summary judgment. Unless the court has any further questions, I'm happy to rest on my briefs. Thank you. I begin the rebuttal with the comment that counsel made about, Peña-Berrero has not even made the prima facie case because he wasn't qualified. But when we look at that qualification, which the district court said was basically like as an analogy, a license. The city had control over that license. It could be waived as a provisional. He could be placed somewhere else. As 55A, he would have been saved from that termination. So if you have a qualification that can be changed by the city under their discretion and they can pick basically winners or losers who they deem to waive through, then it's not a true license or qualification that would prevent plaintiff from making out a prima facie case. And as counsel conceded, the letter to Frank Palmineri for 55A was proper before the settlement. This wasn't fully briefed, but we don't believe that accommodation for a disability can be waived by settlement of a lawsuit. It's not a legal claim. It's an accommodation. And the agency would still be obligated to act on that request. And he followed up verbally. And the conversation that counsel pointed to in the record, we don't think that that was misconstrued at all. That's exactly what we were referring to, that he asked Weir. Weir said, I need to speak to Mr. Kerman about it. Now, if we credit plaintiff's version of that conversation, it would show some acknowledgment of what Section 55A is. If Weir had never heard of it, he would have expected to ask him, well, what is that? I don't know anything about that. So then in the depositions, when they sort of feigned ignorance of it, a reasonable juror can think that they are dissembling to cover something up. And we believe that that would be supported by the record. Now, admitting in the Rule 56 that a personnel officer is the person to contact about 55A, we did not admit that that cannot be a supervisor. Personnel officer is not defined in this one-page, undated pamphlet that the city put together. So it's certainly not clear, and it's a dispute of fact of whether it was proper to follow up with his direct supervisor, Weir, who is clearly also a personnel officer with supervisory responsibilities in the city. You're over your time, so could you wrap up? In closing, we ask that the court reverse the district court's grant of summary judgment. There are tribal issues of fact, particularly on why Mr. Pena-Barrera was blocked from Section 55A. Certainly under the more liberal city standard, he was treated less well because of his disability. Thank you very much. Thank you. Thank you both for your arguments. The court will reserve decision.